1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## NORTHERN DISTRICT OF CALIFORNIA

10

### SAN JOSE DIVISION

11

12  UNITED STATES OF AMERICA,

Plaintiff,

Case No.  15-cr-00203-BLF-1

13

14  v.

**ORDER DENYING DEFENDANT'S
MOTION TO SUPPRESS**

15  HIEN MINH NGUYEN,

[Re:  ECF 63]

Defendant.

16

17          In the course of an interview with Internal Revenue Service ("IRS") agents, Defendant

18  Hein Minh Nguyen, a priest at St. Nicholas Church in Los Altos, confessed to stealing money

19  from his church and failing to report the stolen money on his tax returns.  A grand jury

20  subsequently indicted Defendant on fourteen counts of bank fraud and four counts of tax evasion.

21  Defendant moved to suppress the statements that he made to the IRS agents on the basis that they

22  were:  (1) involuntary; and (2) the product of an un-*Mirandized* custodial interrogation.  The Court

23  held an evidentiary hearing on the motion on April 19, 2016, in which Defendant was represented

24  by counsel.  Having considered the evidence presented at the hearing, the parties' submissions,

25  and the declarations attached thereto, the Court hereby DENIES Defendant's motion to suppress

26  for the reasons discussed below.

27      **I.      BACKGROUND**

28          At approximately 1:45 p.m. on the afternoon of Wednesday, October 17, 2012, Special

*United States District Court*
*Northern District of California*

1  Agents Juan Saavedra and Andres Gonzales of the IRS Criminal Investigations Unit approached

2  Defendant in the parking lot of St. William's Church, a Catholic church in Los Altos.  Hearing

3  Transcript at 7:5, 8:3–16, 27:5–21.  Both agents were dressed in plain clothes.  *Id.* at 7:20–21,

4  31:22–24.  As they approached Defendant, they identified themselves, displayed their badges, and

5  asked whether they could ask him questions regarding his tax returns.  *Id.* at 8:10–16, 8:22–9:3,

6  31:25–32:6.  Defendant agreed to speak with the agents, but suggested that they do so instead at

7  the nearby St. Nicholas Church, where he was a priest.  *Id.* at 8:17–21, 9:4–8, 28:11–24.  The

8  agents agreed, and the three made their way to St. Nicholas Church, about a ten minute drive

9  away.  *Id.* at 9:9–11, 9:23–25, 29:1–20.  Defendant drove in his own car, and Agents Saavedra and

10  Gonzales followed behind in their vehicle.  *Id.* at 9:12–22, 29:4–13.  Upon arriving at St. Nicholas

11  Church, Defendant pulled into the rear parking lot of the church while the agents parked in front of

12  the church along the street.  *Id.* at 10:1–4, 29:21–30:3.  When Defendant emerged from behind the

13  church minutes later, he greeted the agents, opened the front door, and invited them inside.  *Id.* at

14  10:5–20, 30:4–7.

15  Inside the church, Defendant directed Agents Saavedra and Gonzales to a room off to the

16  right side of the church vestibule, and suggested they have their conversation there.  *Id.* at 10:21–

17  11:1, 34:12–17.  The room was about fifteen feet square, windowless, and sparsely furnished with

18  only chairs inside.  *Id.* at 11:3–9, 34:22–35:3.  Defendant arranged three of the chairs together

19  toward the center of the room and offered the agents to sit down.  *Id.* at 11:10–16, 35:4–5.

20  Defendant sat facing the door, and Agents Saavedra and Gonzales sat together facing Defendant,

21  between Defendant and the door.  *Id.* at 11:12–21, 35:6–20.  Agent Saavedra testified that neither

22  his nor Agent Gonzales's seating in the room blocked the door, and that Defendant could easily

23  walk around the agents to exit the room.  *Id.* at 23:25–24:3; 35:12–20.

24  The agents first asked Defendant about his background, including questions about his

25  education, employment with the church, sources of income, financial assets, and bank account and

26  related assets.  *Id.* at 12:17–22, 36:3–10.  Defendant explained that he earned approximately

27  $32,000 a year from the church, not including a housing allowance of $1,000 a month, and gifts

28  from parishioners totaling about $10,000 a year.  *Id.* at 12:23–13:5.  When asked about his other

United States District Court
Northern District of California

2

financial holdings, Defendant explained that he held assets worth about $2 million in bank accounts, certificates of deposit, a vehicle, and a home whose mortgage was fully paid. *Id.* at 13:9–13.

Agents Saavedra and Gonzales then questioned Defendant about the presence of large cash deposits in his bank account, totaling approximately $1.2 million. *Id.* at 13:16–20. On this subject, Agent Saavedra testified that Defendant could not give consistent answers to their questions:

> PROSECUTOR:   And when you asked Father Nguyen about the cash deposits, what happened?
>
> AGENT SAAVEDRA:   He first explained that the cash deposits were gifts from parishioners.
>
> Then he explained that the 1.2 million [dollar] cash deposits were money that his siblings would give him to hold for his parents.
>
> And then he said also that the money was—or the cash deposits were a saving account that he was doing [sic] for the Vietnamese community that couldn't have bank accounts, so he would save money for the Vietnamese community.
>
> Q: What happened after that?
>
> A:   When we further inquired about, well, who is he saving for, what amounts, who does he owe, he couldn't answer those questions.

*Id.* at 13:21–14:9. When the agents remarked that Defendant's answers were inconsistent, Defendant asked the agents for legal advice. *Id.* at 14:10–20. Agents Saavedra and Gonzales answered that they were unable to provide him that information. *Id.* at 14:10–22. Defendant then pressed the agents on what "the worst case scenario [was] if he accepted responsibility." *Id.* 14:23–24. Agent Saavedra told him that he could appear before a judge, and may be sentenced to a jail term. *Id.* at 14:25–15:8. The agent advised Defendant to seek legal counsel from an attorney. *Id.* at 15:8–10. Defendant asked "what the legal exposure would be, or what type of crimes [the agents] would be investigating if he accepted responsibility." *Id.* at 15:17–20. Agent Saavedra answered that if the IRS could prove that he stole money, the charges against him would include mail fraud, wire fraud, money laundering, tax evasion, and structuring cash deposits. *Id.* at 15:21–24.

3

1      At this point, Defendant suggested a break and requested the agents to step outside the

2   room.  *Id.* at 16:3–6, 39:9–12.  The agents complied, shut the door behind them, and conversed

3   among themselves while they waited outside.  *Id.* at 16:7–22.  About fifteen minutes later

4   Defendant emerged from the room and invited the agents back in.  *Id.* at 17:7–11.  Agents

5   Saavedra and Gonzales reentered the room, closed the door behind them, and read to Defendant

6   the IRS Form 5661 Non-Custody Statement of Rights, approximately an hour and a half to two

7   hours into the interview.  *Id.* at 39:9–16.  Agent Saavedra testified that the statement he read was

8   as follows:

9              As the special agent, one of my functions is to investigate the
10           possibility of criminal violations of the Internal Revenue laws, and
             related offenses.

11           In connection with my investigation of your tax liability (or other
12           matter), I would like to ask you some questions.

13           However, first I advise you that under the Fifth Amendment of the
             Constitution of the United States, I cannot compel you to answer
14           any questions or to submit to any information if such answers or
             information might tend to incriminate you in any way.

15           I also advise you that anything which you say and any documents
16           which you submit may be used against you in a criminal proceeding
             which may be undertaken.

17           I advise you further that you may, if you wish, seek the assistance of
             an attorney before responding.

18
             Do you understand these rights?
19
    *Id.* at 18:5–24.  Defendant acknowledged that he understood these rights.  *Id.* at 18:25–19:12.

20      Agents Saavedra and Gonzales then picked up the conversation and again asked Defendant

21   about the $1.2 million in his bank account.  *Id.* at 19:8–12.  Defendant insisted that he did not steal

22   the money, but that instead, the money was cash deposits from savings accounts he held on behalf

23   of the Vietnamese community.  *Id.* at 19:15–18.  When asked, however, to provide records for

24   those deposits, the persons who gave him those deposits, or when those deposits were made,

25   Defendant was unable to provide an answer.  *Id.* at 19:19–22.  Defendant then asked again what

26   his "legal exposure" could be and what charges could be brought against him if he "accepted

27   responsibility to make the case easier."  *Id.* at 19:23–20:16.

28

1       At that point, Defendant then asked for a second break; however, he did not request the

2 agents leave the room. *Id.* at 20:17–18. Agents Saavedra and Gonzales complied with the request,

3 and the two sat silently in the room while Defendant closed his eyes and rested in a meditative

4 state. *Id.* at 20:17–21:1. Neither agent spoke during that time. *Id.* at 21:3–4. After about ten

5 minutes of silence, Defendant reopened his eyes, agreed to speak with the agents about the money,

6 and confessed. *Id.* at 21:8–22:21. As Agent Saavedra explained in his testimony:

7       PROSECUTOR:   And once you explained to Father Nguyen that
there might be a public trial or that he might have to go before the
8       Court, what happened after that?

9       AGENT SAAVEDRA:   At that point he, he stated that he stole
money from the church.
10

11       Q:  Did he tell you anything else?

12       A:  Yes.  And he also said he failed to report the stolen money from
the church on his tax returns.
13
      . . . .
14
      When we showed him his tax returns, he—we showed him, you
15       know, near the beginning of the interview, and he said they were
accurately prepared with the information he provided to his tax
16       return preparer.

17       . . . .

18       After he told us that he stole money from the church, then he told us
that he failed to report that income on his tax returns.
19
      We then said that, you know, we were concerned—the government
20       was concerned that that money shouldn't be moved, and he
promised us that he wouldn't move it and that it would still be there.
21
      Q:  And what happened next?
22
      A:  After that, we pretty much concluded the interview.
23
*Id.* at 21:22–23:2, 26:5–14.
24
25       In all, from the agents' first meeting with Defendant in the parking lot of St. William's

26 Church until the end of the interview, their encounter lasted about four and a half hours. *Id.* at

27 23:5–7. At no point in the interview did Defendant indicate that he wished to end the interview, or

28 seek an attorney. *Id.* at 25:3–8. Agent Saavedra testified that Defendant never requested any

1    periods of rest besides the two breaks, to which the agents agreed. *Id.* at 25:9–13.  Defendant did

2    not request food or drink.  *Id.*  The agent testified that Defendant was free to terminate the

3    encounter and leave at all times during the interview.  *Id.* at 23:16–24; Saavedra Decl. ¶ 26.  The

4    agents did not handcuff Defendant, nor did they arrest him at the end of the interview.  Hearing

5    Transcript at 26:10–12.  Instead, as Agents Saavedra and Gonzales wrapped up with Defendant,

6    they thanked him for speaking with them, and Defendant then escorted the agents out of the

7    church:

8               Q:  Now, you said the interview ended with you telling Father
             Nguyen you didn't want to see the money disappear.
9
             What happened after the interview ended?  Did you arrest Father
10            Nguyen or did he leave on his own free will or something else?

11            A:  When the interview concluded, we got up, thanked him for his
             time, shook his hand, and he escorted us into the vestibule area and
12            out the front door of the church.

13            Q:  Did you arrest Father Nguyen that day?

14            A:  No, we did not.

15   *Id.* at 26:5–15.

16            On December 1, 2015, a grand jury in the Northern District of California returned a

17   superseding indictment charging Defendant with fourteen counts of bank fraud, in violation of 18

18   U.S.C. §§ 1344(1) and (2), and four counts of tax evasion, in violation of 26 U.S.C. § 7201.

19   Superseding Indictment (ECF No. 56).  Thereafter, on March 9, 2016, Defendant filed a motion to

20   suppress the statements he made on the afternoon of October 17, 2012, to Agents Saavedra and

21   Gonzales.  Notice of Motion and Motion to Suppress Statements Made by Defendant ("Mot.,"

22   ECF No. 63).  The motion was fully briefed.  Defendant included a self-attested declaration with

23   his motion papers, *id.* Exh. A ("Nguyen Decl."); the Government included a declaration from

24   Agent Saavedra in its brief in opposition, Response to Defendant's Motion to Suppress ("Opp.,"

25   ECF No. 66), Exh. A.  The Court held a hearing on Defendant's suppression motion on April 19,

26   2016.  (ECF No. 77).  At the hearing, the Government introduced testimony from Agent Saavedra,

27   and also admitted into evidence without objection a one-page document referenced as Form 5661

28   from the IRS manual entitled, "Non-Custody Statement of Rights," marked as Exhibit 2.  (ECF

United States District Court
Northern District of California

6

1   Nos. 77, 79).

2   **II.   DISCUSSION**

3       Defendant moves to suppress statements he made to Agents Saavedra and Gonzales on the

4   afternoon of October 17, 2012.  In support of the motion, Defendant argues that his confession

5   was involuntary because the agents had deceived him into making it, and had used coercive tactics

6   to elicit the statements.  The Government opposes the motion, arguing that Defendant's statements

7   were freely and voluntarily given, and that the agents did not need to *Mirandize* Defendant during

8   the first approximately two-hour portion of the interview because he was not in custody.

9   Although Defendant's motion is directed to the voluntariness issue, at the hearing, the parties

10  focused a great deal on the chronology of events leading up to Defendant's confession,

11  particularly whether or not the agents properly issued the IRS Form 5661 Non-Custody Statement

12  of Rights.  In light of the briefing and the issues raised at the April 19, 2016, hearing on the

13  motion, the Court will address Defendant's arguments on (1) the voluntariness issue, and (2)

14  whether Defendant was subjected to custodial interrogation in violation of his Fifth Amendment

15  rights.

16      **A.   Voluntariness**

17      Defendant first argues that the statements he made to Agents Saavedra and Gonzales

18  warrant suppression because they were not voluntary.  The test in determining the voluntariness of

19  a confession is "whether a defendant's will was overborne by the circumstances surrounding the

20  giving of a confession."  *Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir. 2011) (citing *Dickerson v.*

21  *United States*, 530 U.S. 428, 434 (2000)) (citation and internal quotation marks omitted).

22  Voluntariness of a defendant's confession is a fact-sensitive inquiry that requires "close scrutiny

23  of the facts of individual cases."  *Gallegos v. Colorado*, 370 U.S. 49, 52 (1962) (emphasis added).

24  "The due process test takes into consideration the totality of all the surrounding circumstances—

25  both the characteristics of the accused and the details of the interrogation."  *Dickerson*, 530 U.S. at

26  434 (citations and internal quotation marks omitted); *see also Reck v. Pate*, 367 U.S. 433, 440

27  (1961).  "The length of the questioning, the use of fear to break a suspect, [and] the youth of the

28  accused are illustrative of the circumstances on which cases of this kind turn."  *Gallegos*, 370 U.S.

*United States District Court*
*Northern District of California*

at 52. The government bears the burden to prove that a confession was voluntary by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

### i. Defendant's Statements Were Voluntary

The Court finds the circumstances presented here as a whole indicate that Defendant made his statements to Agents Saavedra and Gonzales voluntarily. The Government provided evidence showing the following chronology. When the agents first approached Defendant, they introduced themselves and inquired whether they could ask Defendant questions about his tax returns. Defendant agreed, and brought the agents to his church to speak. In securing Defendant's cooperation, the agents did not induce Defendant to accede to their request by threat or any promise. Moreover, during the interview, the agents remained cordial and conversational throughout. They did not brandish handcuffs, display their service weapons, or otherwise compel Defendant's presence to answer questions. When Defendant suggested that they take breaks during the interview, Agents Saavedra and Gonzales complied with both requests. At no time in the course of the interview did Defendant request food or drink, or convey a desire to terminate the interview. Neither is there evidence that Defendant suffered from a particularly vulnerable mental state. Agent Saavedra testified that Defendant understood and was proficient in the English language, and remained cognizant throughout. Defendant did not appear to be anxious at any point in the interview, and instead remained calm up to and including the point at which he made his statements.

In all, this case bears little similarity to those cases in which courts found involuntary confessions. There were no threats to Defendant's safety, *see, e.g.*, *United States v. Jenkins*, 938 F.2d 934, 939–40 (9th Cir. 1991), or the safety of his family, *see, e.g.*, *Rogers v. Richmond*, 365 U.S. 534, 538, 541 (1961); *United States v. Moreno*, 891 F.2d 247, 249 (9th Cir. 1989). There were no threats of physical punishment, *see, e.g.*, *United States v. Eccles*, 850 F.2d 1357, 1360 (9th Cir. 1988). Defendant was never denied food, clothing, or medical treatment, *see, e.g.*, *Reck*, 367 U.S. at 441–42. There is no evidence that Defendant suffered any mental disorder, *see, e.g.*, *Blackburn v. Alabama*, 361 U.S. 199, 200–01, 207–08 (1960), was intoxicated, *see, e.g.*, *Beecher v. Alabama*, 408 U.S. 234, 236–37 (1972); *United States v. Guaydacan*, 470 F.2d 1173, 1173–74

(9th Cir. 1992), was especially young, *Haley v. State of Ohio*, 332 U.S. 596, 597 (1948); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973), or had a low level of education or intelligence, *see, e.g.*, *Blackburn*, 361 U.S. at 200–01, 207–08. In short, the agents' actions were proper, and Defendant's statements were not involuntary.

### ii.   Statements As Products Of Trickery Or Deceit

In arguing that his statements were not voluntary, Defendant claims that "[he] was tricked as to the role and intention of the agents, and that the agents used [his] confusion to deceive him into believing that he had to admit guilt to something, even if he knew he was not guilty of anything." Mot. at 4. To the contrary, none of the evidence demonstrates any trickery or deceit. The agents were forthright when they presented themselves as IRS agents seeking to ask Defendant questions about his tax returns. They were forthright when, in explaining what Defendant's "legal exposure" was, they listed the pertinent charges and the criminal penalties he could face. When Defendant asked them for legal advice, the agents responded that they could not give legal advice and suggested instead that he seek a lawyer. Defendant has not presented any evidence to suggest these facts to be inaccurate.

### iii.   Statements As Products Of Coercion Or Duress

Defendant argues in the alternative that he was coerced into making his statements because they were extracted over the course of a four and a half hour long interview with Agents Saavedra and Gonzales. Although the Ninth Circuit has held that a lengthy interrogation may weigh in favor of finding a confession involuntary, it has also cautioned that that fact is not by itself dispositive. *See, e.g.*, *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810–11 (9th Cir. 2003) (petitioner's confession following an eight-hour interrogation not involuntary); *Clark v. Murphy*, 331 F.3d 1062, 1073 (9th Cir. 2003) (same). The Government has adduced evidence showing that the length of the interview was not coercive, that breaks were taken as requested by Defendant, that the interrogation did not take place during regular meal times (here, from approximately 1:45 p.m. to 6:10 p.m.), and that Defendant was free to leave at any time. Defendant has cited to no other facts to buttress his argument that the length of time presented in this case rendered his confession involuntary. The absence of any such references may be because there are no other

United States District Court
Northern District of California

facts to suggest circumstances rising to the level of duress.

Instead, Defendant relies heavily on a Ninth Circuit case, *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981), to argue that the agents' conduct here rose to the level of duress.  In *Tingle*, the court held that the defendant's confession was extracted by police conduct that was "patently coercive."  *Id.* at 1336.  That case is, however, readily distinguishable from the facts here.  In *Tingle*, police officers responded to a report of a bank robbery and arrived on scene to find the defendant, Tingle, bound and gagged in the back room of a bank office.  *Id.* at 1333.  When asked what happened, Tingle told the officers that she had been attacked by an unknown assailant who tied her up and stole money from the bank safe.  *Id.*  The officers were skeptical of her account, however, because of the "amateurish commission" of the heist.  *Id.*  They escorted Tingle to the back of a squad car, and then proceeded to interrogate her.  *Id.*  Over the course of the hour-long interview, the interrogating officer "recited a virtual litany of the maximum penalties" facing her, totaling a jail term of forty years.  *Id.* at 1336.  Moreover, when the officer learned that Tingle had a two-year-old child, the officer used that information to warn Tingle that she had "a lot at stake," and might not see her child "for a while."  *Id.* at 1334.  The officer advised Tingle to cooperate, and that her cooperation would be conveyed to the prosecutor.  *Id.*  Otherwise, the officer warned, the prosecutor would be told that Tingle was "stubborn or hard-headed."  *Id.*  Tingle began to shake during the interrogation, and continued to cry for at least ten minutes.  *Id.*  She eventually confessed that together with her boyfriend, they had planned to stage a robbery of the bank, in which she would open the safe, he would arrive, bound and gag her, and then leave with the money.  *Id.*

In determining whether Tingle's confession was voluntary or not, the Ninth Circuit explained that "express threats" on the part of police officers may "bludgeon a defendant into failure of the will."  *Id.* at 1335.  So too, the court warned, would "[s]ubtle psychological coercion . . . overbear 'a rational intellect and a free will.'"  *Id.*  The *Tingle* court explained that "[w]hen law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation,' they exert the 'improper influence' proscribed in *Malloy* [*v. Hogan*, 378 U.S. 1 (1964)]."  *Id.* at 1336.  Those threats that

10

United States District Court
Northern District of California

1   Tingle may be removed from her child, taken together with the officer's warnings that Tingle

2   could face a lengthy prison term, that she had "a lot at stake," and that her cooperation or

3   noncooperation would be communicated to the prosecutor, exacted a "psychological coercion"

4   that ultimately forced Tingle's confession. *Id.* at 1337. Given these circumstances, the Ninth

5   Circuit concluded, Tingle's confession was not "the product of a rational intellect and a free will,"

6   and was therefore involuntary. *Id.*

7         Defendant analogizes to *Tingle* to claim that Agents Saavedra and Gonzales had similarly

8   exerted a psychological pressure on him to extract a confession. He argues that, like in *Tingle*, he

9   was placed in an oppressive setting—a small windowless room used by clergy at the church to

10   hold confessions. Mot. at 6. He also argues that the agents took advantage of his vulnerability

11   and concern for the reputation of the church to elicit the incriminating statements. *Id.*; Reply (ECF

12   No. 65) at 4 ("[Defendant's] statements . . . were obtained by the IRS agents through a deliberative

13   process of . . . psychological exploitation of [his] deep and abiding love for the Catholic Church

14   . . . ."). The Court disagrees.

15         For one, Defendant's claim misconstrues the facts. The room in which the interview took

16   place was one that he himself chose. The Court is hard-pressed to find improper psychological

17   coercion where, given the freedom to select where to speak with Agents Saavedra and Gonzales,

18   Defendant was at liberty to choose the setting. In addition, there are no facts to suggest that the

19   agents took advantage of Defendant's vulnerability and concern for the church to extract his

20   confession. It may have been the case that Defendant's piety motivated him in some degree to

21   confess. However even then, as the Supreme Court has explained, divine inspiration does not

22   itself render a confession involuntary. *See Colorado v. Connelly*, 479 U.S. 157, 160–64 (1986)

23   ("Respondent's perception of coercion flowing from the 'voice of God,' however important or

24   significant such a perception may be in other disciplines, is a matter to which the United States

25   Constitution does not speak."). The evidence set forth here show that the agents made no threats

26   or promises to secure Defendant's cooperation. Their tone was at all times conversational and

27   respectful. When Defendant asked what his "legal exposure" could be, the agents answered

28   truthfully. Simply put, the facts here stand in sharp contrast to those presented in *Tingle*.

United States District Court
Northern District of California

In all, the Court finds unconvincing Defendant's arguments that he was tricked and coerced into making a confession. Defendant's reliance on *Tingle* is unavailing because the circumstances that were present there, an officer's overt threats made during a squad car interrogation, are readily distinguishable from those here. The Court finds that Defendant's will was not overborne when he made his statements to Agents Saavedra and Gonzales in the course of their interview on the afternoon of October 17, 2012. Accordingly, the Court concludes that his statements were voluntary.

**B.      Custodial Interrogation Under *Miranda v. Arizona***

Defendant also argues that his statements to Agents Saavedra and Gonzales should be suppressed because they were the product of un-*Mirandized* custodial interrogation. The Fifth Amendment privilege against self-incrimination requires that a person be advised of certain rights if they are "in custody" and "subjected to interrogation." *Miranda v. Arizona*, 384 U.S. 436, 467–468 (1966). The government's failure to provide such advisements renders statements made by a person during a custodial interrogation inadmissible. *See id.* Because neither party disputes that Defendant was interrogated, the Court addresses the issue of whether Defendant was in custody. *See* Mot. at 1; Opp. at 8. The Court's analysis is limited to the first portion of the interview, prior to the agents' administration of the *Miranda* admonitions.

Whether a person is in custody requires the court to determine "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotation marks omitted); *see also Thompson v. Keohane*, 516 U.S. 99, 112 (1995). If in considering the totality of the circumstances a reasonable person would not feel free to leave the interrogation, then the interrogation is considered custodial. *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). Generally, a reasonable person would not feel free to leave if "something [is] said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969); *see also Dyer v. Hornbeck*, 706 F.3d 1134, 1143 (9th Cir. 2013) (M. Smith, J., concurring) (explaining that circumstances and authorities' psychological

12

1  pressure created a setting of custody, despite the fact that the detainee was aware of her physical

2  ability to leave during an unescorted bathroom break, or out of an unlocked door of the

3  interrogation room).

4          As an initial matter, the Court notes that "the Ninth Circuit has never decided which side

5  bears the initial burden of proving custody or a lack of custody." *United States v. Paiz*, No. CR

6  06–00710 WHA, 2007 WL 1052891, at *3 n.2 (N.D. Cal. Apr. 5, 2007); *accord United States v.*

7  *Hayes*, No. 13-CR-00085-JD-1, 2014 WL 5408425, at *3 (N.D. Cal. Oct. 22, 2014).  However, at

8  the hearing, both parties agreed that for purposes of this motion, Defendant bore the burden to

9  prove custody.  Hearing Transcript at 4:9–14.  This is in agreement with opinions issued from the

10  Second, Fifth, Sixth, and Eighth Circuits, as well as from numerous district courts that have

11  explicitly held that a defendant bears the burden of proving he was in custody at the time

12  incriminating statements were made.  *See, e.g.*, *United States v. Jorgensen*, 871 F.2d 725, 729 (8th

13  Cir. 1989); *United States v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986); *United States v. Davis*, 792

14  F.2d 1299, 1308 (5th Cir. 1986); *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980);

15  *United States v. Abbas*, 418 F. Supp. 2d 280, 285 (W.D.N.Y. 2006); *United States v. Donaldson*,

16  493 F. Supp. 2d 998, 1003 (S.D. Ohio 2006); *United States v. Morriss*, No. 06–6010, 2006 WL

17  3519344 (W.D. Mo. Dec. 6, 2006).

18              **i.    Defendant Was Not In Custody For Purposes Of *Miranda***

19          The Ninth Circuit has set forth the following non-exhaustive list of factors that are

20  particularly relevant to the custody inquiry:  "(1) the language used to summon the individual; (2)

21  the extent to which the defendant is confronted with evidence of guilt; (3) the physical

22  surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure

23  applied to detain the individual."  *Kim*, 292 F.3d at 973 (quoting *United States v. Hayden,* 260

24  F.3d 1062, 1066 (9th Cir. 2001)) (internal quotation marks omitted).  Other factors may also be

25  "pertinent to, and even dispositive of, the ultimate determination whether a reasonable person

26  would have believed he could freely walk away from the interrogators."  *Id.* at 974.  For the

27  reasons further explained below, the Court finds that here, in the totality of the circumstances,

28  Defendant was not in custody.

United States District Court
Northern District of California

United States District Court
Northern District of California

a.   The Language Used To Summon Defendant

The first *Kim* factor directs the Court to consider the language used to summon Defendant. Where a defendant voluntarily consents to speak with police officers, such a circumstance suggests that the interrogation was non-custodial.  *United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009) ("Where we have found an interrogation non-custodial, we have emphasized that the defendant 'agreed to accompany' officers to the police station or to an interrogation room."). Here, the Government presented evidence that on the afternoon of October 17, 2012, Agents Saavedra and Gonzales approached Defendant during daytime hours and asked him if he would speak with them about his tax returns.  There were no threats accompanying the agents' introduction, nor did they make any promises to secure Defendant's acquiescence.  The words used by the agents to summon Defendant were inquiries, not commands.  *See Kim*, 292 F.3d at 974–75 ("If the police ask—not order—someone to speak to them and that person comes to the police station, voluntarily, precisely to do so, the individual is likely to expect that he can end the encounter.").  It was under these circumstances that Defendant agreed to answer questions.  This factor weighs against a finding of custody.

b.   The Extent To Which Defendant Was Confronted With Evidence Of Guilt

Next, the Court considers the extent to which the Government confronted Defendant with evidence of guilt.  The Ninth Circuit has explained that this factor weighs in favor of finding the interrogation custodial when the tone of the questioning is "aggressive, coercive, and deceptive." *Bassignani*, 575 F.3d at 884–85.  In contrast, when the interview is a "consensual" conversation "conducted in an open, friendly tone," this factor weighs in favor of finding the interrogation non-custodial.  *Id.*  The Court finds that the latter, and not the former, best characterizes the setting here.

Agent Saavedra credibly testified that he and Agent Gonzales approached Defendant outdoors, in a church parking lot and informed him that they would like to ask him questions about his tax returns.  Their tone was "conversational," they were dressed in plain clothes, did not draw their service weapons, did not command any conduct, agreed to Defendant's request to move the questioning to his home church, a ten minute drive away, and did not search Defendant before

14

the questioning.  In all, the Court finds that the overall tone was neither aggressive, coercive, nor deceptive, but was instead a consensual conversation conducted in a cordial manner.  *See Bassignani*, 575 F.3d at 884–85.  This factor therefore weighs against a finding of custody.

### c.   The Physical Surroundings Of The Interrogation

The third *Kim* factor instructs the Court to consider the physical surroundings of the interrogation.  When an interrogation is conducted in familiar surroundings, this factor weighs against a finding that the defendant was in custody.  *United States v. Eide*, 875 F.2d 1429, 1437 (9th Cir. 1989).  The Court finds it significant that here, Agents Saavedra and Gonzales agreed to speak with Defendant on his terms, at his chosen location.  Although the agents first approached Defendant in the parking lot of St. William's Church in the early afternoon, Defendant redirected the agents to his own church, St. Nicholas Church, to speak.  Defendant drove in his own vehicle to get there, and the agents followed behind.  Once at St. Nicholas Church, Defendant parked his vehicle in the church's rear lot while the agents parked in front of the church, where they waited for Defendant to meet them.  Once inside, it was Defendant—and not the agents—who chose to use the windowless room to the side of the vestibule to speak.  As explained in testimony, the room measured approximately fifteen feet square—dimensions that the Ninth Circuit has described as "small, but not oppressively so."  *Dyer*, 706 F.3d at 1140.

Inside the room, Defendant arranged chairs for the men to sit, and the three then proceeded to have the interview.  As Agent Saavedra testified, according to the way Defendant arranged the chairs, neither he nor Agent Gonzales sat blocking the exit, and Defendant was able leave the room if he so chose by walking around the agents to the door.  These facts—an interview conducted during daytime hours, a self-chosen and familiar setting, the presence of only two agents dressed in plain clothes, no obstruction of the doorway—strongly weigh against a finding of custody, and stand in contrast to those other settings in which courts have found the physical surroundings of an interrogation so oppressive as to give rise to a finding of custody.  *Cf. United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013) (finding custody where the defendant was searched and escorted through an electronically locked door inside a government probation building, where normally the defendant's parole meetings occurred through a window in the

lobby); *Carroll*, 102 F. Supp. 3d at 1138 (finding custody where the defendant was interrogated in a small room in a police station about a ten-minute drive from his motel and was reliant upon the officers for his transport home).

### d.   The Duration Of The Detention

Next, Court considers the duration of the interrogation.  Lengthy questioning often weighs in favor of a finding that a defendant was in custody.  *See Bassignani*, 575 F.3d at 886. While courts have not established a specific length of time that defines a custodial interview, the Ninth Circuit has held that hours-long interviews favor the conclusion that a defendant was in custody. *See, e.g.*, *Barnes*, 713 F.3d at 1204 (finding an interrogation lasting roughly two hours indicative of custody); *Bassignani*, 575 F.3d at 886 (finding a two and a half hour long interrogation "at the high end"); *see also United States v. Carroll*, 102 F. Supp. 3d 1134, 1139 (N.D. Cal. 2015) (explaining that a two-hour long interview "generally weighs toward a finding of custody").  Here, the Government does not dispute that Agents Saavedra and Gonzales had interviewed Defendant for approximately one and a half to two hours before reading to him the IRS Form 5661 Non-Custody Statement of Rights.  Opp. at 3.  Under relevant case law in this Circuit, the Court finds that this factor weighs in favor of custody.

### e.   The Degree Of Pressure Applied To Detain Defendant

Finally, *Kim* directs the Court to consider the degree of pressure used to detain Defendant. By itself, the absence of physical restraints is not dispositive.  *Barnes*, 713 F.3d at 1203.  Instead, the inquiry considers the extent that officers subjected a defendant to both physical and psychological force in the course of the interview.  *Dyer*, 706 F.3d at 1143–44 (M. Smith, J., concurring).  In this case, Defendant was never handcuffed or otherwise physically restrained at any point while interacting with Agents Saavedra and Gonzales.  The room in which they spoke was never locked, and Defendant was at all times free to leave.  The tenor of the interview was conversational, collegial, and respectful.  Neither agent raised his voice, nor did the agents ever engage in an accusatory manner over the course of the interview.  Indeed, at the end of it, Agents Saavedra and Gonzales shook Defendant's hand and thanked him for his time.  Defendant then escorted the agents outside whereupon they parted ways.  Defendant does not dispute any of these

United States District Court
Northern District of California

16

facts as presented by the Government.

The Court finds it significant that no arrest was made that day.  At times, an officer's statement that a suspect is not under arrest means little if, given other circumstances, no reasonable person in the suspect's setting would have felt free to leave.  This is particularly true when at the end of such an interaction with police officers the suspect is arrested on site.  In those cases, the suspect may have already been "in custody" for purposes of *Miranda* long before the actual arrest was made.  The on-site arrest raises the spectre of custodial interrogation notwithstanding the officer's rote pronouncements to the contrary, and courts are wary to scrutinize such circumstances to ensure that the suspect's Fifth Amendment protections were not violated.  Here, however, no such circumstances were present.  When the interview ended, Agents Saavedra and Gonzales shook Defendant's hand, thanked him for speaking with them, and then left.  *See Bassignani*, 575 F.3d at 886 (citing *United States v. Leese*, 176 F.3d 740, 744 (3d Cir. 1999) (finding no custody when, among other things, the defendant "was specifically informed that when the questioning was concluded the inspectors would be returning to Harrisburg and she would not be going with them")).  The low degree of pressure applied to detain Defendant, together with the absence of an arrest at the end of the interview, further weigh against a finding of custody.

### f.   The Totality Of The Circumstances

All told, the Court concludes that the first, second, third, and fifth *Kim* factors together weigh heavily against finding that Defendant was in custody.  The fourth factor, the duration of Defendant's interview with Agents Saavedra and Gonzales, weighs in favor of a finding of custodial interrogation.  As the custodial analysis requires the Court to consider all the circumstances in its entirety, however, no one factor is alone dispositive of the issue.  In addition, in some contexts, some factors may be accorded greater weight, and others less.

As to the durational prong of the *Kim* analysis specifically, the Ninth Circuit has explained that where the interview "[is] not a 'marathon session designed to force a confession,'" courts "accord less weight to this factor."  *Bassignani*, 575 F.3d at 886 (quoting *Davis v. Allsbrooks*, 778 F.2d 168, 171(4th Cir. 1985)).  Indeed, the appellate court has on several occasions held that a

suspect was not subjected to custodial interrogation where, notwithstanding the extended duration of the interview, other factors weighed heavily against custody.  In *Bassignani*, the Ninth Circuit held that a defendant whose interrogation took place in familiar surroundings, and who was not pressured by officers to confess, was not in custody for purposes of *Miranda*, even though the interrogation took place over two and a half hours.  *Id.* at 884–87.  Similarly in *United States v. Manning*, the Ninth Circuit affirmed the district court's conclusion that the defendant was not in custody despite questioning that lasted for "over four hours," because she was free to leave, and the agents did not threaten, restrain, or subject the defendant to any physical or psychological pressure during the interview.  312 F. App'x 34, 35 (9th Cir. 2009).

Other factors may in some circumstances be given more weight.  In *Dyer*, the Ninth Circuit affirmed the district court's conclusion that the defendant there was not in custody, finding it significant that she had agreed to accompany officers to a police station and was told that she was not under arrest and was free to leave.  706 F.3d at 1139 (citing *Oregon v. Mathiason*, 429 U.S. 492 (1977)).  The court discussed a prior opinion that was relied on in *Mathiason*, noting that there, "the '[d]efendant agreed to go to the FBI office,' and we explicitly labeled as 'most significant for resolving the question of custody' the fact that the '[d]efendant was expressly told that he was not under arrest.'"  *Id.* at 1139 (citing *Crawford*, 372 F.3d at 1059–60).  These factors weighed heavily against finding custody for purposes of *Miranda*.

So too does the Court ultimately find against custodial interrogation here.  Only one of the *Kim* factors points to a finding of custody, but the many other facts presented in this case clearly tip the scale in favor of a finding of non-custody.  Agents Saavedra and Gonzales asked, not commanded, Defendant to speak with them about his tax returns.  Defendant dictated the terms under which the interview would take place by directing the agents to his own church, in a room of his choice.  The agents remained at all times cordial and respectful.  They presented to Defendant copies of his tax forms, but did not engage in strong-arm tactics that accused Defendant of guilt.  When Defendant requested breaks, the agents complied with each one.  Defendant never requested food or drink, or indicate he wished to terminate the interview or seek an attorney.  At the end of the interview, Agents Saavedra and Gonzales shook Defendant's hand, thanked him for

18

1   his time, and left.  Examined in its totality, the facts here do not indicate that Defendant was in

2   custody.

3                ii.      Reliance On *Ortiz* And *Williams*

4          In support of his argument that his statements should be suppressed as the product of un-

5   *Mirandized* custodial interrogation, Defendant relies on two recent cases from this district, *United*

6   *States v. Ortiz*, No. 12-cr-00119 SI (N.D. Cal. July 9, 2014), and *United States v. Williams*, No.

7   13-CR-00764-WHO-1, 2015 WL 5138517, at *1 (N.D. Cal. Sept. 1, 2015).  However, neither case

8   is pertinent to the custody inquiry in this case, as both *Ortiz* and *Williams* centered around the

9   routine booking question exception to the *Miranda* rule, an issue not present here.

10         *Ortiz* involved a RICO gang prosecution in which the government sought to include

11   answers that defendants had given to a booking officer following an arrest.  *Ortiz*, slip op. at 1.

12   Those answers connected the defendants with a gang under investigation.  *Id.*  The defendants

13   moved to suppress those answers on the basis that they were the product of an un-*Mirandized*

14   custodial interrogation.  *Id.*  The government opposed the motion, arguing that they were

15   statements made in response to routine booking questions and therefore fell outside the ambit of

16   the *Miranda* requirement.  *Id.* at 2.  In the Court's order, Judge Illston explained that unlike typical

17   answers to routine booking questions, in that case, questions of the defendants' gang affiliations

18   were directly related to the crimes for which they were arrested.  *Id.*  "[W]here a large part of the

19   government's burden at trial involves proving that these defendants were members of a RICO

20   enterprise, admitting defendants' un-*Mirandized* admissions of gang membership would be

21   patently unfair."  *Id.* at 3.  The court granted the defendants' motion to suppress.  *Id.*

22         *Williams* presented similar facts.  *Williams*, 2015 WL 5138517, at *1.  There, the

23   defendant moved to suppress statements he made to a booking officer following an arrest on

24   murder and firearms charges.  *Id.*  During booking, when the officer asked him if was affiliated

25   with a particular gang, the defendant answered, "Yeah, I hang out there, put me where I'm from."

26   *Id.*  Based in part on this answer, the government later brought RICO charges against the

27   defendant.  *Id.* at 2.  In the order on the defendant's suppression motion, Judge Orrick rejected the

28   government's argument that the answer was admissible as evidence at trial because it was a

United States District Court
Northern District of California

19

response to a routine booking question. *Id.* He explained that unlike questions regularly asked during booking, there, "the officer should have known that the question was reasonably likely to elicit incriminating information." *Id.* at 3. Such statements, the Judge concluded, could not be admitted as evidence at trial absent a *Miranda* warning. *Id.* The court granted the defendant's motion to suppress. *Id.* at 5.

The facts in *Ortiz* and *Williams* hardly resemble those here. Defendant was asked to answer questions about his tax returns. He agreed to speak, and led the agents to a room in his church to do so. Defendant was free to terminate the interview and leave at any time. He was not under arrest, nor was he being booked into custody. The routine booking question exception, carved out for the purpose of "secur[ing] the biographical data necessary to complete booking or pretrial services," *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (citation and internal quotation marks omitted), simply does not apply here. Defendant additionally cites to *Ortiz* and *Williams* to argue that "[t]he nature of the questions posed by the IRS agents Saavedra and Gonzales here reveals that the questions were likely to elicit incriminating responses." That the agents' questions were likely to elicit incriminating responses is not disputed. The question, however, is whether the agents had improperly subjected Defendant to custodial interrogation prior to the administration of *Miranda* warnings. For the reasons discussed above, the Court concludes that the agents did not, because Defendant was not at that time in custody.

### iii. Defendant's Self-Attested Declaration

Defendant offered a self-attested declaration in support of his motion, stating that during his interview with Agents Saavedra and Gonzales, he did not feel free to leave. Mot. Exh. A (Declaration of Hien Minh Nguyen) ¶ 7 ("During that entire time, I did not believe that I had the ability to freely leave the room."). The Supreme Court and the Ninth Circuit have made clear, however, that in determining the presence of a custodial setting for purposes of *Miranda*, "the 'subjective views harbored by . . . the person being questioned' are irrelevant." *J.D.B. v. N. Carolina*, 564 U.S. 261, 271 (2011) (citing *Stansbury*, 511 U.S. at 323); *Smith v. Clark*, 804 F.3d 983, 992 (9th Cir. 2015) ("The custody determination is objective and is not based upon 'the subjective views of the officers or the individual being questioned.'" (quoting *Bassignani*, 575

1    F.3d at 883)).  "The test [for custody], in other words, involves no consideration of the 'actual

2    mindset' of the particular suspect subjected to police questioning."  *J.D.B.*, 564 U.S. at 271

3    (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 667 (2004); *California v. Beheler*, 463 U.S.

4    1121, 1125, n.3 (1983) (per curiam)).  Defendant's subjective feeling that he was unable to leave

5    the interview has no bearing on whether he was in custody for purposes of *Miranda*.

6                  **iv.    The IRS Form 5661 Non-Custody Statement Of Rights**

7            Finally, Defendant makes much of the fact that Agents Saavedra and Gonzales did not

8    administer the IRS Form 5661 Non-Custody Statement of Rights until one and a half to two hours

9    into the interview with Defendant, apparently in contravention to IRS protocol.  Defendant points

10   out that the IRS manual instructs agents to read the Form 5661 statement "[a]t the outset of your

11   first official meeting with the subject of the investigation . . . ."  Exhibit 2 ("Exh. 2"); *id.* at 38:18–

12   39:5.  The manual also required agents to "identify yourself as a special agent of the IRS and

13   produce authorized credentials."  Exh. 2.  During the hearing on this motion, counsel for

14   Defendant engaged in lengthy exchanges with Agent Saavedra on cross-examination as to whether

15   the agents followed IRS protocol in failing to give the Form 5661 statement at the outset of their

16   meeting with Defendant.  Hearing Transcript at 36:22–44:20.  Agent Saavedra testified that IRS

17   Form 5661 was context-specific, and applied only in administrative investigations of a subject, not

18   in grand jury investigations.  *Id.* at 40:14–44:20.  Defendant then pressed Agent Saavedra on

19   whether or not the IRS manual expressly distinguished between administrative and grand jury

20   investigations with respect to the applicability of IRS protocol.  *Id.* at 44:5–20.

21           Defendant's focus on the proper administrative procedure accompanying the issuance of a

22   Form 5661 warning misses the point.  Although whether and at what point the IRS manual

23   required Agents Saavedra and Gonzales to administer the Form 5661 Non-Custody Statement of

24   Rights might bear on an administrative proceeding (for which the Court makes no determination),

25   it has no bearing in this constitutional context.  For Fifth Amendment purposes, the analysis is

26   whether a person is "in custody," and "subjected to interrogation."  *Miranda*, 384 U.S. at 467; *see

27   also United States v. Gutierrez-Salinas*, No. 14-50556, 2016 WL 696499, at *3 (9th Cir. Feb. 22,

28   2016).  For the reasons discussed above, the Court finds that Defendant was not in custody during

United States District Court
Northern District of California

21

the initial portion of the interview so as to require the administration of *Miranda* warnings. Defendant was properly provided his *Miranda* rights at the midpoint of the interrogation and thus, none of his later statements are contested on this point.

**III.    ORDER**

      For the foregoing reasons, the Court concludes that Defendant's statements were voluntary.  The Court also concludes that Defendant was not subjected to custodial interrogation in violation of his Fifth Amendment rights.  Defendant's motion to suppress is therefore DENIED.

Dated:  May 5, 2016

                                                    BETH LABSON FREEMAN
                                                    United States District Judge

United States District Court
Northern District of California